**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **HOLLY MOLLET,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 16-cv-0293-MJR-DGW** |
| | ) | |
| **ST. JOSEPH'S HOSPITAL BREESE,** | ) | |
| **OF THE HOSPITAL SISTERS OF THE** | ) | |
| **THIRD ORDER OF ST. FRANCIS d/b/a** | ) | |
| **HSHS ST. JOSEPH'S HOSPITAL** | ) | |
| **BREESE, and HOSPITAL SISTERS** | ) | |
| **HEALTH SYSTEM,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM & ORDER</u>**

REAGAN, Chief Judge:

**A. <u>Introduction</u>**

Holly Mollet was employed as a certified respiratory therapist at St. Joseph's

Hospital in Breese, Illinois from March 2011 through December 7, 2015, when she was

fired. She filed suit in this Court in March 2016 alleging that Defendants St. Joseph's

Hospital Breese of the Hospital Sisters of the Third Order of St. Francis ("St. Joseph's")

and Hospital Sisters Health System ("HSHS") discharged her in retaliation for taking

Family and Medical Leave Act (FMLA) leave in 2015 and for filing claims for

unemployment benefits in 2014 and 2015.

Now before the Court are Defendants' March 31, 2017, motion for summary

judgment and supporting memorandum (Docs. 34, 35), to which Plaintiff responded on

May 4, 2017 (Doc. 38), and Defendants replied on May 18, 2017 (Doc. 39). For the

reasons delineated below, the Court grants the Defendants' motion for summary judgment.

### B. Factual Allegations

In 2002, Holly Mollet began working at St. Elizabeth's Hospital in Belleville, Illinois. St. Elizabeth's is a member of the HSHS hospital system. While employed by St. Elizabeth's, Mollet began also working part-time at St. Joseph's Hospital in Breese, Illinois, another member of the HSHS hospital system. In March 2011, she transferred to a position based solely at St. Joseph's Hospital and began working as a certified respiratory therapist assigned to the night shift in the cardiopulmonary department. (Doc. 35-2, p. 12-15). During her scheduled shifts, she was the only certified respiratory therapist on duty. *Id.*

When Mollet transferred to St. Joseph's, she was given an HSHS Colleague Handbook that contained the hospital's policies for employees, including policies addressing attendance and leave procedures. (Doc. 38-1, p. 205). The handbook included a policy for disciplining employees who have routine and chronic occurrences of unscheduled absences. (Doc. 38-1, p. 238-40). Unscheduled absences are defined as the "[f]ailure to report for a scheduled shift or consecutive shifts, whatever the reason, including a medically verified illness." *Id.* at 238. FMLA leave-related absences are exempted from the policy.

Unscheduled absences remain on an employee's record for twelve months. If an employee has three unscheduled absence occurrences within twelve months, the employee receives coaching, or a verbal warning, from a supervisor. After five

occurrences, the policy calls for written counseling of the employee. After seven occurrences, corrective action is taken, and the employee is given a final written warning. If an employee has eight occurrences in twelve months, the policy calls for termination. An absence for one full day or for multiple days for the same reason is treated as a single occurrence. The attendance policy also provides for termination of an employee who "fails to report to work for three consecutive days without talking to the leader [of their department]." *Id.* at 239.

The cardiopulmonary department also has its own policy for employees who are unable to work when scheduled. Employees are required to contact Amy Culpepper, the Director of Cardiopulmonary, or the Department Facilitator to provide notice for unplanned absences. (Doc. 35-2, p. 18-19, 104, 252). During her deposition, Culpepper testified that her department is very small, only 6 or 7 certified respiratory therapists are on staff to provide respiratory and cardiac support to patients in the emergency room and nursery, and ample notification of unplanned absences is necessary for patient safety. Night shift employees like Mollet are required to provide at least three hours' notice for unplanned absences so that the department can ensure adequate staffing. (Doc. 35-2, p. 252).

Culpepper kept track of her employees' unscheduled absences on an attendance log and on the schedules that she prepared for the cardiopulmonary department. (Doc. 35-2, p. 136). Mollet's first unscheduled absences on Culpepper's attendance log were on October 4, 2012, and November 14 through November 15, 2012. (Doc. 35-2, p. 268). Mollet had unscheduled absence occurrences again on July 2-4, 2013, and January 1,

2014. On January 26, 2014, Mollet filed an unemployment claim with the Illinois Department of Employment Security (IDES), requesting benefits because of reduced work hours. St. Joseph's opposed the claim, writing to IDES on February 3, 2014, that Mollet had opportunities to work additional hours during the period in question but declined to do so. Robert Otrembiak, the Director of People Services, expressed to IDES that St. Joseph's did not understand why the claim was filed. (Doc. 38-1, p. 203). Mollet received unemployment benefits despite the protest by the hospital.

Mollet had additional unscheduled absences on February 13, 2014, and February 24 through 25, 2014. Having accrued four occurrences in a twelve month period, Mollet received coaching in the form of a verbal warning from Culpepper on March 8, 2014. After the coaching, Mollet had another unscheduled absence on March 18, 2014. She received written counseling and was given a written performance improvement plan warning her that she needed to improve her attendance on March 25, 2014. (Doc. 35-2, p. 279). Mollet was scheduled to attend a training seminar on April 29, 2014. She sent a text message to Culpepper on April 28 that said she would miss the training due to a toothache. Mollet asked if she would be fired. Culpepper told Mollet that the absence would count as an unscheduled absence and that she would check whether she was subject to termination. (Doc. 35-2, p. 271). In a text message sent on April 29, Culpepper told Mollet, "Today is 6th UA. 7 is corrective action, 8 is termination." (Doc. 35-2, p. 271).

On May 2, 2014, Otrembiak again protested the award of unemployment compensation to Mollet, writing that he believed she was ineligible for benefits because

she was actively employed by St. Joseph's with no break in her employment during the period for which the hospital received a bill. (Doc. 38-1, p. 204). Following an unscheduled absence occurrence from May 20 through 21, 2014, Mollet received a corrective action, a performance improvement plan that contained a final written warning from Culpepper, on May 23, 2014. Mollet had an unscheduled absence on October 1, 2014, but the July 2013 unscheduled absences were no longer on her record. The October 2014 absence was treated as a seventh occurrence. Mollet had an eighth unscheduled absence on December 4, 2014, and, according to the attendance policy, was subject to termination. (Doc. 35-2, p. 267).

Following the December 2014 absence, Culpepper testified that she decided to terminate Mollet's employment due to the excessive absences. (Doc. 35-2, p. 136). Culpepper told Mollet she was fired by telephone on December 5, 2014. (Doc. 35-2, p. 32, 121). Mollet requested a meeting with Culpepper and Culpepper's supervisor, Jene Bieri, Director of Human Services. (Doc. 35-2, p. 32, 121, 166). Following a conversation Bieri had with Mollet's mother, also a St. Joseph's employee, Bieri and Culpepper, along with Otrembiak and the administrative team, decided to make an exception and convert Mollet's termination to a suspension. (Doc 35-2, p. 166-68).

Mollet, Bieri, and Culpepper met on December 18, 2014, to discuss Mollet's employment status. Bieri and Culpepper testified that they told Mollet their decision to convert her termination to a suspension was premised on a new requirement that she have no unscheduled absences for one year. (Doc. 35-2, p. 123-24, 169-70). Mollet testified that she was never told that any further absences would result in her

termination. (Doc. 35-2, p. 40-41). Mollet was given a final written warning in a written performance improvement plan that documented the suspension. The document noted Mollet's "continued failure to abide by HSHS attendance policy" and that it was expected that Mollet would have "attendance within HSHS guidelines." (Doc. 35-2, p. 284). It did not state specifically that Mollet would be fired if she accrued any unscheduled absences in the next twelve months.  After serving the suspension, Mollet returned to work. Culpepper testified that Mollet called off work often after being reinstated but that she did not accrue another unscheduled absence because she either asked her co-workers to cover her shifts, switched shifts, or came to work after her attempts to switch failed. (Doc. 35-2, p. 123-24).

In April 2015, Mollet filed a second claim for unemployment benefits with IDES. The hospital again protested her claim, but Mollet received the benefits over St. Joseph's objection. In June 2015, Mollet developed pneumonia and was hospitalized. She applied for, and was granted, FMLA leave from June 11, 2015, through July 19, 2015. (Doc. 35-2, p. 23-26, 253, 257). St. Joseph's FMLA leave policy requires an employee to provide medical certification to support claims for FMLA leave. Employees are expected to respond to requests for certification and recertification within 15 days. The policy warned that failing to "provide certification or recertification may result in the denial of leave and time not protected under FMLA." Doc. 38-1, (p. 248).

Mollet was scheduled to return to work on July 20, but she did not return until August 4, 2015. St. Joseph's FMLA leave was administered by Unum, and Unum requested documentation from Mollet to certify that she was eligible for FMLA leave

from July 20 through August 3, 2015. (Doc. 35-2, p. 253, 257, 265). Mollet never submitted the required documentation, and her absences between those dates were never approved as FMLA leave. Mollet presented a note to St. Joseph's from a nurse practitioner at her doctor's office that said she was cleared to return to work on August 4, 2015, but the note was not given to UNUM and did not provide the information required to certify her need for FMLA leave. (Doc. 35-2, p. 23-25). Despite Mollet failing to submit the medical certifications, Culpepper allowed her to return to work and did not mark the unapproved leave as an unscheduled absence on Mollet's attendance log.

Beginning in at least 2013, Mollet's yearly performance reviews documented her problems with attendance at work. Her review for the year ending in June 2013 appraisal noted that Mollet needed to improve her accountability, a category that rated Mollet's dependability and ability to report to work as scheduled. The comments noted she had three unscheduled absences that year and missed 72 hours of work as a result. (Doc. 38-1, p. 283-86). Mollet's June 2014 appraisal also noted that she needed to improve her accountability. Culpepper wrote that Mollet had too many absences that year and had been issued a final warning. (Doc. 38-1, p. 304). In the June 2015 appraisal, Mollet's accountability was rated as unsatisfactory and the comments stated that, "Attendance was an issue addressed last year and continues to be a problem. A final written warning has been given to Holly on the issue of attendance." (Doc. 38-1, p. 293).

The issues with Mollet's attendance came to a head after she did not report for scheduled shifts from November 30 through December 3, 2015. Mollet testified that she had a sinus infection and could not recall who she called to report that she would not be

at work for those shifts. (Doc. 35-2, p. 38). She could not recall whether she contacted Culpepper at all regarding her absences other than by text message on December 2, 2015. (Doc. 35-2, p. 38). Culpepper testified that she received a text message on December 1, 2015, from a woman named Gennifer, the Department Facilitator, who had covered Mollet's November 30 shift, informing her that Mollet would not be at work that night either. According to Culpepper, Mollet did not contact her, as required by hospital and department policy, until Culpepper received a text message from Mollet on December 2, 2015. (Doc. 35-2, p. 37-39).

In the days following her absences, Mollet had a phone conversation with Culpepper, and a meeting was scheduled to discuss Mollet's attendance. (Doc. 35-2, p. 38-39). In the interim, Culpepper informed Otrembiak and other administrators that she wanted to fire Mollet. Culpepper, Otrembiak, and a witness, Dana Zvonar, met with Mollet on December 7, 2015. (Doc. 35-2, p. 39-40). Mollet was presented with a written corrective action performance improvement plan that stated that she was informed on December 18, 2014, that further unscheduled absences would result in termination and that she had unscheduled absences from November 30 through December 3, 2015. The document also stated that Mollet "had numerous additional absences that were not counted against her in the last year: a number of absences for an approved leave and regular absences for which she asks her peers to cover for her – some say she asks them every pay period, with very little notice." (Doc. 38-1, p. 267). According to the corrective action form, Mollet was being fired for excessive absences following her final warning on December 18, 2014, for her continued failure to abide by HSHS policy. (Doc. 38-1, p.

267). Mollet was presented with a termination letter at the meeting and was fired from her position as certified respiratory therapist.

### C. <u>Summary Judgment Standard</u>

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *Archdiocese of Milwaukee v. Doe*, **743 F.3d 1101, 1105 (7th Cir. 2014),** *citing* **FED. R. CIV. P. 56(a).** *Accord Anderson v. Donahoe*, **699 F.3d 989, 994 (7th Cir. 2012).** A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, **477 U.S. 242, 248 (1986).** *Accord Bunn v. Khoury Enterpr., Inc.*, **753 F.3d 676, 681-82 (7th Cir. 2014).** In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the non-movant. *Anderson,* **699 F.3d at 994;** *Delapaz v. Richardson*, **634 F.3d 895, 899 (7th Cir. 2011).**

### D. <u>Retaliation under the Family Medical Leave Act</u>

The FMLA provides eligible employees who suffer from a serious medical condition with up to twelve weeks of unpaid leave during any twelve-month period. **29 U.S.C. § 2612(a)(1)(D)**. Employers are prohibited from retaliating against an employee's use or attempted use of FMLA. **29 U.S.C. § 2612(a)(2)**. FMLA retaliation claims are evaluated the same way as a retaliation claim under other employment statutes. *Buie v. Quad/Graphics, Inc.*, **366 F.3d 496, 503 (7th Cir. 2004).** To survive summary judgment on an FMLA retaliation claim, an employee must "point to evidence supporting a

reasonable inference that she was fired because she took protected leave." ***Tibbs v. Admin. Office of the Ill. Courts*, --- F.3d ---, 2017 WL 2627822 (7th Cir. 2017).** The question is whether all of the evidence taken as a whole "would permit a reasonable factfinder to conclude that the plaintiff … [taking FMLA leave] caused the discharge." ***Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).**

The burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), applies to FMLA retaliation lawsuits. ***Ortiz*, 834 F.3d at 766.** To succeed on a retaliatory discharge claim, an employee first must establish a prima facie case of retaliation by showing that: (1) she engaged in a protected activity; (2) her employer took adverse action against her; and (3) there is a causal link between the protected activity and the adverse employment action. ***King v. Preferred Technical Group*, 166 F.3d 887 (7th Cir. 1999).** If an employee establishes a prima facie case of retaliation, the burden of production shifts to the employer who must articulate a legitimate, non-discriminatory reason for the adverse employment action. ***Id.*** If the employer rebuts the prima facie case, then the employee "has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision" and that the "employer's proffered reasons are merely a pretext for discrimination." ***Id.* (internal quotation and citing references omitted)**. Pretext "involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action." ***Burton v. Bd. Of Regents of the Univ. of Wis. Sys.*, 851 F.3d 690, 698 (7th Cir. 2017)(quoting *Harden v. Marion County Sheriff's Dept.*, 799 F.3d 857, 864 (7th Cir. 2015)**. An employee must show more than mere disagreement with an

employer's reasons and present "evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the termination." *Tibbs*, **2017 WL 2627822 at \*3 (citations omitted).**

The parties do not dispute that Mollet engaged in a protected activity, taking FMLA leave, or that she was terminated, an adverse employment action. As a result, to establish a prima facie case of retaliatory discharge, Mollet must show that there is a causal link between her FMLA leave and her termination. Defendants argue that Mollet has presented no evidence of a causal link between the two events. Mollet argues that the reference to a "number of absences for an approved leave" that "were not counted against her" in the corrective action that documented her termination provides a causal link because it uses "were." Mollet argues that the past tense nature of the language shows that the absences were not held against her in the past but were held against her when she terminated. The language Mollet relies on is, if viewed in a light most favorable to her, ambiguous. Without more, it is insufficient to allow a reasonable factfinder to conclude that she was fired because she took FMLA leave.

Even if Mollet could establish a causal link between her FMLA leave and her termination, no reasonable juror could conclude that Defendants' proffered reason for terminating Mollet, her attendance issues, is pretextual. Mollet argues that a reasonable juror could conclude that Defendant's insistence that they fired her for "excessive absences" is a lie because her absences were not excessive under St. Joseph's usual attendance policy. She argues that Defendants manufactured the condition that, after

her termination was reversed in 2014, she was not allowed to have another unexcused absence for twelve months. Defendants argue that their proffered reason is not pretextual because the timing of Mollet's termination is not suspicious and they allowed her to remain on leave even after she failed to submit the required documentation, undermining any claim of retaliation. They also note that Mollet was an at-will employee who could be fired at any time, regardless of any attendance policy and that the record provides ample evidence of Mollet's issues with unscheduled absences.

Mollet faces large hurdles in establishing that Defendants' proffered reason for her termination is pretextual. The parties dispute whether Mollet was subject to an individualized attendance policy after her December 2014 suspension. Defendants' position is supported by Mollet's June 2015 performance appraisal, which states that she was subject to a final warning for her attendance problems. Even if Mollet is correct that she was not subject to a special attendance policy, that merely establishes that her termination was not in accordance with the hospital's usual attendance policy. But it is too great a leap from arguing that Mollet was not disciplined in accordance with the usual policy to the conclusion that the "excessive absence" justification is a lie.

Defendants' proffered reason for terminating Mollet is neither factually baseless nor insufficient to motivate Defendants to terminate her. The uncontroverted evidence shows that Mollet struggled with attendance throughout 2014 and was terminated in December 2014 for excessive absences, though Defendants made an exception and converted her termination to a suspension. Mollet's attendance struggles were documented over three years of performance appraisals, with the 2014 and 2015

appraisals specifically stating that Mollet was subject to a final written warning regarding her attendance. The termination letter given to Mollet when she was fired listed excessive absences as the reason for her firing, and the performance improvement plan documenting her termination references her attendance problems multiple times. She was terminated immediately after being absent from work for four days and several months after she took FMLA leave, undercutting any potential argument that the timing of her termination was suspicious.

The record does not contain evidence that could convince a reasonable juror that Defendants' explanation for Mollet's termination is dishonest. Mollet's claims of retaliation are highly speculative, even when taken in the light most favorable to her as the non-moving party, and no reasonable juror could conclude that she was terminated in retaliation for taking FMLA leave. Accordingly, Defendants' motion for summary judgment on Plaintiff's FMLA retaliation claim is **GRANTED**.

**E.  Retaliatory Discharge under Illinois Law**

Illinois is an at-will employment state, and an employer generally may discharge an employee for any reason at any time. *Kelsay v. Motorola, Inc.*, **384 N.E.2d 353, 360 (Ill. 1978).** Retaliatory discharge claims have been recognized as a narrow exception to this general rule. *See Michael v. Precisions Alliance Group, LLC*, **21 N.E.3d 1183, 1188 (Ill. 2014).** To succeed on a claim that she was terminated in retaliation for filing an unemployment insurance claim, an employee must prove: (1) that she was an employee; (2) that she exercised a right granted by the Unemployment Insurance Act; and (3) that she was discharged and her discharge was causally connected to her filing

the unemployment claim. *See Clemons v. Mechanical Devices*, **704 N.E.2d 403, 406 (Ill. 1998).** Illinois does not apply the *McDonnell Douglas* burden shifting framework applied in federal retaliation cases to resolve retaliatory discharge claims. *Gordon v. FedEx Freight, Inc.*, **674 F.3d 769, 774 (7th Cir. 2012).** Instead, the burden is on the employee to establish a causal relationship. Establishing causation "requires more than a discharge in connection with filing a claim." *Marin v. American Meat Packing Co.*, **562 N.E.2d 282, 286 (Ill. 1990)**. An employee "must affirmatively show that the discharge was primarily in retaliation for [her] exercise of a protected right." *Gordon*, **674 F.3d 774 (alteration in original, citation omitted)**. "But-for causation is not sufficient to establish retaliatory discharge." *Phillips v. Continental Tire The Americas, LLC*, **743 F.3d 475, 478 (7th Cir. 2014)**.

The parties agree that Mollet was an employee of St. Joseph's, that she filed unemployment claims in 2014 and 2015, and that she was discharged. Mollet must establish a causal link showing that her termination was primarily in retaliation for her filing unemployment claims. She argues that Culpepper sought counsel from Bieri and Otrembiak before firing her and that Otrembiak was the person who was responsible for challenging her unemployment claims. She argues that Defendants received notice that their protest of her 2014 unemployment insurance claim came five days before she was presented with a corrective action by Culpepper. Mollet alleges, and Defendants deny, that she was told "not to make a stink" because she was on Otrembiak's radar. Because Otrembiak also protested Mollet's 2015 claim, Mollet argues that a reasonable juror could conclude that he held an animus towards her for two years and that led him

to concur with the decision to terminate Mollet. Defendants counter that the timing of the May 2014 corrective action was tied directly to Mollet's absences. They argue that any May 2014 comments, which they deny were made, about Mollet being on Otrembiak's radar were too far removed in time from her termination to evidence a retaliatory intent. Defendants also note that contesting unemployment insurance claims is within their rights as an employer if they reasonably believe they have legitimate grounds to do so.

At a minimum, to demonstrate a causal link Mollet must establish that the relevant decision-maker in her termination knew that she had filed an unemployment insurance claim. *See Hillman v. City of Chicago*, 834 F.3d 787, 794 (7th Cir. 2016). Drawing all inferences in favor of Mollet, Culpepper consulted with Otrembiak and People Services before terminating Mollet, so at least some, if not all, of the people involved in the decision to terminate her were aware that she had filed unemployment claims in 2014 and 2015. Beyond that, however, Mollet relies largely on speculation that Otrembiak wanted her to be fired based on statements Culpepper allegedly made more than 18 months before her termination about Mollet being on his radar. Otrembiak's opposition, even if vigorous, to her unemployment insurance claims long before her termination is insufficient to establish that her termination was primarily in retaliation for her filing the claims. The argument that he would not have "encouraged" her termination had she not filed the claims relies on the "but-for" causation that Illinois courts have declared insufficient to establish a causal link.

Similarly, Mollet's argument about the suspicious timing of her May 2014 discipline is not persuasive evidence of a causal link between her unemployment claims and her termination. Mollet was disciplined on May 23, 2014, following absences on May 20 and 21, 2014. She suggests that she was disciplined because on May 18, 2014, St. Joseph's received notification that their protest of her unemployment insurance claims was overruled. Beyond what she considers suspicious timing, Mollet provides no convincing evidence that her discipline was retaliatory or that the alleged retaliatory nature of the corrective action is tied in any way to her December 2015 termination, other than somehow demonstrating Otrembiak's animus towards her.

As discussed above, the record reflects that Culpepper first raised the issue of terminating Mollet following Mollet's four day absence from work. Mollet had well-documented problems with attendance. She speculates, but provides no evidence, that Otrembiak had such hostility over her unemployment claims that he encouraged her termination because of the claims, but she cannot overcome the evidence of her poor attendance to establish that she was fired primarily because she sought unemployment benefits.

No reasonable juror could conclude that there is a causal link between her termination and her exercise of a protected right. Accordingly, Defendants' motion for summary judgment on Count II is **GRANTED**.

F. **Whether HSHS was Mollet's Employer**

Defendant HSHS also seeks summary judgment, arguing that it was not Mollet's employer. Because the Court has found that Mollet's claims fail as a matter of law, the

Court does not reach the question of whether HSHS was Mollet's employer.

## Conclusion

For all the above reasons, Defendants' motion for summary judgment is **GRANTED**. The Clerk of Court is directed to enter judgment in favor of Defendants St. Joseph's Hospital Breese of the Hospital Sisters of the Third Order of St. Francis and Hospital Sisters Health System and against Plaintiff Holly Mollet. As no claims remain before the Court, all pending motions are **DENIED as moot** and all settings herein are **CANCELED**.

**IT IS SO ORDERED**.

DATED: June 27, 2017

_s/ Michael J. Reagan_
MICHAEL J. REAGAN
**Chief Judge**
**United States District Court**
